# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EMILY PERRYMAN,                             )
                                            )
                         Plaintiff,         )        Case No. 2:14-cv-01951-GMN-GWF
                                            )
vs.                                         )
                                            )        **FINDINGS AND**
CAROLYN W. COLVIN, Acting Commissioner      )        **RECOMMENDATION**
of Social Security Administration,          )
                                            )
                                            )
                         Defendant.         )
_____   )

       This matter is before the Court on Plaintiff Emily Perryman's Complaint for Review of Final
Decision of the Commissioner of Social Security (#3), filed on December 19, 2014.  The Acting
Commissioner filed her Answer (#11) on February 22, 2015.  Plaintiff filed her Motion for Reversal
and/or Remand (#15) on March 23, 2015.  The Acting Commissioner filed her Cross-Motion to
Affirm and Response to Plaintiff's Motion for Reversal (#18) on May 22, 2015.  Plaintiff filed her
Reply (#22 ) on June 5, 2015.

## BACKGROUND

### A.    Procedural History.

       Plaintiff filed an application for a period of disability and disability insurance benefits on
February 8, 2011, alleging that she became disabled beginning December 5, 2009.  *See*
Administrative Record ("AR") 146-147.  The Commissioner denied Plaintiff's application initially
on December 9, 2011, and upon reconsideration on March 23, 2012.  AR 95-99, 103-105.  Plaintiff
requested a hearing before an Administrative Law Judge ("ALJ") on April 5, 2012.  AR 106.  The
hearing was conducted on April 8, 2013 at which Plaintiff appeared and testified.  AR 23-78.

1   Plaintiff's father also testified at the hearing, as did a vocational expert.  The ALJ issued his decision

2   on May 29, 2013 and concluded that Plaintiff was not disabled from December 5, 2009 through the

3   date of his decision.  AR 9-17.  Plaintiff's request for review by the Appeals Council was denied on

4   September 23, 2013.  AR 1-4.  Plaintiff then commenced this action for judicial review pursuant to

5   42 U.S.C. § 405(g).  This matter has been referred to the undersigned magistrate judge for a report of

6   findings and recommendations pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

7         **B.   Factual Background.**

8         **1.   Plaintiff's Disability/Work History Reports and Hearing Testimony**

9         Plaintiff Emily Perryman was born on August 12, 1975.  AR 146.  She is 5 feet, 4 inches tall

10   and weighed 175 pounds at the time of the hearing on April 8, 2013.  AR 37.  Plaintiff is married and

11   has two children.  Her daughter was 15 years old and her son was five at the time of the hearing.  AR

12   30.  Ms. Perryman completed high school in 1993.  AR 166.  She took a few classes after high

13   school, but had no post-high school degrees or specialized education.  AR 30-31.

14         Plaintiff was previously employed as a cashier, and then by two banks as a customer service

15   manager and private banking administrator.[1]  AR 167, 175.  Ms. Perryman testified that in her first

16   banking job with Bank of America she worked in new accounts as a teller/customer service

17   supervisor.  AR 31.  In her second job as a private banking administrator for Colonial Bank, she

18   started as a teller and then went into wealth management/private banking.  She was an assistant to

19   private bankers and managed the office.  She opened new accounts, scheduled private banker's

20   appointments, and went outside the bank office to meet with clients and serve their needs.  Ms.

21   Perryman also helped with event planning and setting up wealth seminars.  AR 32-35.  Plaintiff was

22   terminated from her employment with Colonial Bank in May 2009.  AR 156, 175.  She testified that

23   she had been on ninety days leave due to migraine headaches.  Upon her return to work, she was

24   terminated on the grounds that "I bounced a check when I was gone, and they said it was a breach

25   because I was an employee [and] to bounce a check was against policy."  AR 36-37.

26

27    

28       [1] The record is confusing as to what dates she was employed in these jobs.  It appears, however, that her second banking job ended in May 2009 and she did not work after that date.

Ms. Perryman testified that she had weighed as high as 202 pounds in January 2012, but her cardiologist changed her medication to try and reduce her weight.  Her medications caused her to tire easily and she sometimes got the "shakes."  She stated that she could get the shakes on a daily basis or could go a day or two without them.  AR 37.  Plaintiff was using a cane at the time of the hearing.  She stated that she sometimes used a walker depending on how bad her hips and legs were.  AR 38.  She had "a lot of neuropathy" in her legs and lost feeling in them.  She had microdiscectomy surgery at L4-L5 of the lumbar spine in June 2010.  Her doctors "said part of [the neuropathy] was because of calcification of the nerve endings.  But then it spread after I had the surgery."  AR 39.  Ms. Perryman testified that about a year after the surgery, the neuropathy began affecting her right leg to the point where she could hardly walk.  She was admitted to St. Rose Hospital, but no nerve tests were conducted.  AR 47.  Although a medical record indicated that she did not have numbness in the face, chest or upper extremities, she testified that she experienced intermittent facial numbness and believed that it was increasing.  She experienced it once every one to two months and it lasted for a few days at a time.  Plaintiff also had numbness in the palms of her hands up through the fingertips, mostly on the left side.  This numbness could last for one, two or three days.  She described the numbness sensations as similar to the feeling of one's foot falling asleep—a tingling, sharp, shooting sensation.  AR 48-49.

Ms. Perryman testified that she did not have ringing in the ears.  She had occasional vomiting which she attributed to the side-effects of medication.  She did not have double vision, but she did have problems with her peripheral vision.  She also had blurred vision at night time.  She became dizzy if she moved too quickly.  She also had constant back and neck pain.  AR 58-60.  She testified that she had migraine headaches once or twice a month and that they lasted two to three days.  She could do basic things when she had a migraine, such use the bathroom, but it was better for her to lie down in the dark and silence.  AR 50.

Ms. Perryman testified that she drove an automobile, but limited her driving to three or four days a week.  She picked her daughter up from her practices at school.  She did not drive to the grocery store more than once every month or two months.  Her husband worked in a grocery store and picked up most of the groceries when he got off work.  He also drove her to the grocery store

1    once a month for more detailed shopping.  On those occasions, she spent 30-45 minutes in the store.

2    AR 40-41.  Her husband did most of household cleaning.  She washed or rinsed a few dishes.  She

3    cooked pre-made meals that she heated up, but did not make any meals that required her to stand and

4    prepare them.  Her husband and daughter did the laundry, vacuuming and sweeping.  AR 41-42.  Her

5    family had a small dog, goldfish and a hamster which her children cared for.

6         Plaintiff testified that she sat in a recliner chair and watched television approximately four

7    hours during the day, in one or two hour blocks of time  AR 42.  She took a nap every day after

8    walking with her son to the school bus stop which was located eight houses away.  She used her cane

9    or walker during this trip.  She tried to take this walk every day because her doctors said she should

10   exercise.  AR 51-52.  After walking her son to the bus stop, however, she was "completely wiped

11   out" and immediately took a nap.  AR 52.  When asked why she did not do more chores, Ms.

12   Perryman stated "I get tired very easily.  It's hard for me to move around.  I get a lot of neuropathy,

13   like in my hands and stuff as well to where– ."  AR 42-43.

14        Plaintiff did not know what caused her symptoms.  She stated that "[t]hey've done tests.  I

15   don't know if its from my back problems.  They're not sure what's causing it to spread."  The

16   doctors were not sure if her symptoms were caused by her lumbar spine condition or "if its because

17   the pseudotumor with the spinal fluid.  They're not really sure why its spreads."  AR 43.  Although

18   she had numbness in her legs, arms, hands and face, the nerve testing had centered on her legs where

19   she had constant numbness.  AR 43.  She had not shaved her legs in over two years because she

20   could not feel the pressure of the razor and had cut herself badly.  The vibration from an electric

21   razor was unbearable.  AR 54-55.

22        Ms. Perryman testified that she could stand in one place for about 20 minutes if she shifted

23   back and forth on her feet. Her legs then became very weak and started to shake.  She could walk for

24   about 15 to 20 minutes with assistance of a cane or walker.  She then started to get very tired, the

25   numbness increased and she felt "nerve spasms" starting to increase.  AR 44-45.  She could not sit

26   straight up with her legs down for more than 10-15 minutes.  She could sit for about 20 minutes

27   when she leaned back in a chair.  The longer she sat, however, the more intense and severe her leg

28   and hip pain became.  She was most comfortable in a reclined position.  AR 46.

Ms. Perryman also testified that she suffered from depression.  She became very moody, cried and was easily upset by something she was not able to do.  AR 52.  She cited as examples, her inability to be involved in her daughter's and son's activities.  "I can't go play volleyball with her.  I can't play T-ball with my son.  Can't take my daughter shopping."  AR 52-53.  She interacted with her children by "just sitting there."  She read to her son and tried to help him with his homework.  She let him jump on a trampoline because she could watch from a nearby hammock, but she could not take him hiking, or go to the park or playground unless someone else was also present to watch him.  AR 53.  She testified that her daughter helped a lot in caring for her son by dressing him, getting him showered and putting him to bed.  Her husband worked three jobs and was not able to help with these chores.  AR 53-54.  Plaintiff testified that she had not seen a psychiatrist or psychologist because she had not been referred to one.  Her primary care physician, Dr. Chaney, prescribed Zoloft for her depression.  AR 57.

The ALJ asked Plaintiff about her examination by Dr. Ferrell.[2]  Ms. Perryman testified that she was referred to Dr. [Farrow] by her primary care doctor, Dr. Chaney, who wanted her to see a different neurologist than Dr. Evangelista.  AR 55.  Dr. Chaney wanted her to go to the "Brain Institute" or a specialty clinic, but her insurance would not cover it.  AR 56.  She did not see another neurologist after her examination by Dr. [Farrow].  Dr. Chaney tried to refer her to other doctors, but it would take three to six months to get a referral and the referral doctors' offices then stated that they did not take Plaintiff's insurance.  AR 56.  As of January or February 2013, Dr. Chaney was still researching other medical providers or consultants to send her to or, in the alternative, was considering referring her back to Dr. Evangelista.  AR 57.

Ms. Perryman's father, Robert G. Ducaj II, testified that he saw the Plaintiff about once every other week.  AR 73.  He stated that she would function okay for a period of time, but then would be barely able to walk.  He took her to a doctor and neurologist and paid for testing "and done everything that we could possibly do."  Mr. Ducaj was the chief operating officer of a small gaming

---

[2] This appears to be a reference to Dr. Simon Farrow, a neurologist, who examined Plaintiff on October 31, 2011.  AR 463-464.  There is no indication of a Dr. "Ferrell" in the records.

company that operated progressive link games such as MegaBucks, across the United States. His other daughter worked for the company and operated a computer to verify and pay winners. He would have hired Plaintiff to perform this same job if she was able to do it. Mr. Ducaj stated that Plaintiff could not work for his company because she would have to climb a flight of stairs. She also suffered from migraine headaches which caused her to drift off. He stated that "you just can't rely on her being there working." He did not believe Plaintiff could be present at work on a regular basis due to her physical illness and he didn't believe she could be trusted to make the precise decisions required to work in the business. AR 74-75. The ALJ asked whether Plaintiff could work as a receptionist. Mr. Ducaj said he did not believe she could man the reception desk from 7:30 A.M. until 7:30 P.M. because she could not physically sit that long or be present at work on a regular basis. AR 76. Mr. Ducaj also submitted a written statement prior to the hearing which was generally consistent with his testimony. AR 240-241.

Vocational Expert Robin Generaux testified that Plaintiff's past work as a bank teller/customer service representative was light work. Her past work as a personnel scheduler qualified as sedentary work. Plaintiff had also worked as a cashier which was light work. AR 61-62. The ALJ asked the vocational expert to assume a person of claimant's age, education and experience was capable of working at the light exertional level. The person could only occasionally climb ramps or stairs, never climb ropes, ladders or scaffolds. The person could frequently balance, stoop, kneel, crouch and crawl. The person would need to avoid even moderate exposure to hazardous machinery, unprotected heights, and operational controlled moving machinery, except that she could occasionally operate a motor vehicle. The ALJ asked whether the person would be able to perform any of Plaintiff's past relevant work. The vocational expert testified that the person could perform all of Plaintiff's past work. AR 62-63. The person could also perform the sedentary jobs of information clerk, interviewer, bookkeeper and the light jobs of general office clerk, cashier, and hand packer which were available in substantial numbers in the national and Nevada economies. AR 63-66.

Plaintiff's counsel asked whether the person would be able to work if she had migraine headaches one to two times a month and would miss four days of work per month. The vocational

1   expert testified that such a person could not perform any of Plaintiff's past work or the other light

2   and sedentary jobs she identified.  AR 69.  The ALJ asked whether the person could perform

3   Plaintiff's past work or the other jobs if a sit/stand option was included, meaning that the job could

4   be done either sitting or standing, and alternating between those positions with the time in each

5   position and the frequency of change at the discretion of the employee.  The vocation expert testified

6   that the employment base for many of the jobs would be eroded.  She testified that with this

7   additional limitation, the person could still work as a personnel scheduler, general office clerk,

8   information clerk, interviewer, credit clerk, or order clerk.  AR 69-72.

9           **2.**       **Statements of Plaintiff's Husband and Daughter.**

10         Plaintiff's husband, Nevin Perryman, completed a third party function report on April 10,

11   2011.  Mr. Perryman stated that Plaintiff can only sit, stand, and lift for a short amount of time and

12   that it was hard for her to do the simplest tasks.  AR 191.  He indicated that on typical day Plaintiff

13   got up, fed the children, and got their 13 year-old daughter ready for school. Plaintiff's sister helped

14   with their three year old son until Mr. Perryman got home from work.  Mr. Perryman stated that

15   Plaintiff did not sleep well.  Her back and legs always hurt.  She needed help putting on socks,

16   pants, and shoes.  She could only take short showers and needed help using the bath.  She sometimes

17   needed help using the toilet.  AR 192.  Plaintiff was able to prepare simple meals on a daily basis.

18   He noted that meals were much better before she was hurt.  Plaintiff did "surface" cleaning, but Mr.

19   Perryman and his daughter did most of the cleaning.  It was hard for her to do chores, "so we try not

20   to let her do much."  AR 193.  Plaintiff went outside daily and she was able to drive and ride in a car.

21   She was able to shop in stores for groceries on Saturday only.  She could pay bills, count change,

22   handle a savings account and use a checkbook or money order.  AR 194.

23         Mr. Perryman stated that Plaintiff spent time with him and their children and that she loved to

24   read.  Her participation in these activities depended on how she was feeling.  She went to all of their

25   daughter's functions.  AR 195.  Plaintiff's illness affected her ability to lift, squat, bend, stand, reach,

26   walk, sit, kneel, and climb stairs.  It also affected her memory and concentration and her ability to

27   use her hands.  She could walk about one-half block before needing to stop and rest.  Her ability to

28   resume walking depended on how her leg and back were doing.  AR 196.  Mr. Perryman stated that

1   Plaintiff did not handle stress well and was taking medication for it.  She also used a cane.  AR 197.

2          Mr. Perryman also submitted a written statement in support of his wife's claim on April 7,

3   2013.  AR 245-246.  He stated that Plaintiff was only able to take their son to the bus stop and was

4   exhausted afterwards.  He worked three jobs to support the family and their two children helped

5   Plaintiff as much as they could.  Mr. Perryman did all of the cleaning and laundry.  His son helped by

6   feeding the pets.  His daughter helped by taking care of their son and also with some of the dinners.

7   Mr. Perryman stated that Plaintiff "has a lot of problems going up and down the stairs.  She spends

8   most of her time in the recliner downstairs.  The recliner is the most comfortable place in the house.

9   She has lots of problems sleeping and staying awake because of the lack of sleep.  The pain she deals

10  with is horrible.  Some days are worse than others."  AR 245-246.

11         Plaintiff's daughter also submitted a written statement on April 7, 2013.  She stated that she

12  helps her mother by watching her brother, helping him to get dressed or to bed and sometimes

13  helping him with his homework and getting him ready for the bus.  She also did some of the cooking

14  and cleaning.  She stated that Plaintiff was hurting a lot of the time and could not do much.  It was

15  hard for Plaintiff to go shopping and she got tired easily.  AR 243-244.

16         **3.    Medical Records.**

17         Plaintiff was evaluated and treated by Dr George Petroff of Dunn Neurological Associates

18  from September 14, 2004 until February 8, 2005.  AR 616-627.  Ms. Perryman initially told Dr.

19  Petroff that she had recurrent low back problems and now had arm complaints.  She stated that she

20  had a sudden spasm in her back in June 2003 while standing, and that two subsequent episodes had

21  occurred.  Her pain radiated from the back down along her right lateral thigh and leg to her foot.  Her

22  legs became numb if she sat for more than 15 minutes.  She also had numbness from her elbows to

23  her wrists and hands.  This numbness occurred while driving or when she awoke in the morning.

24  She also felt shaky and fatigued all over, especially after taking a shower.  AR 626.  Dr. Petroff noted

25  that an August 2004 MRI of the lumbar spine showed a disc bulge at L4-5, with minimal foraminal

26  stenosis.  AR 626.  On examination, Dr. Petroff noted trace weakness of the right extensor hallucis

27  longus, give-way on right hip flexor testing, and straight leg raise positive on the right.  Plaintiff's

28  gait was antalgic. Cranial, motor, sensory, coordination and gait testing were normal.  The right

1    lumbosacral area was tender to palpation.  Dr. Petroff's impression was lumbosacral degenerative

2    disc disease, and "[a]ddress cervical cord disease, syrinx, multiple sclerosis, stenosis versus carpal

3    tunnel syndrome, atypical presentation."  AR 627.

4         An MRI of Plaintiff's cervical spine on September 22, 2004 showed slight exaggeration of

5    the normal lordotic curve, a possible intrinsic spinal cord abnormality at the C5 level and possible

6    neural foraminal stenosis on the right at C2-3 and bilaterally at C3-4 and C4-5.  AR 622.  On

7    October 5, 2004, Dr. Petroff noted that Plaintiff's symptoms were unchanged although she had less

8    discomfort.  Nerve conduction studies were normal.  Electromyography demonstrated some mild

9    denervation/reinnervation change in the right C7 innervated triceps and in the left deltoid C5 and

10   biceps C6.  Dr. Petroff's impression was "cervical degenerative change; address demyelinating

11   disease."  AR 620.  An MRI scan of Plaintiff's brain on October 19, 2004 was within normal limits.

12   AR 625.  On October 26, 2004, Plaintiff reported that her arm numbness was less noticeable, but still

13   present at times.  She continued to have leg numbness, but she was able to sit for a longer period

14   before it started.  She also had stress bladder incontinence.  On examination, Plaintiff had normal

15   mental status, cranial, motor, sensory, coordination and gait testing.  Dr. Petroff's diagnosis was (1)

16   [d]emyelinating disease; differential diagnosis multiple sclerosis, transverse myelitis, and (2)

17   congenital abnormality of the cervical spine.  He recommended a lumbar puncture.  AR 623.

18        On November 11, 2004, Plaintiff reported some headaches and blurring of vision.  There was

19   no change in her arm numbness.  Dr. Petroff noted that the brain MRI was normal.  Plaintiff

20   underwent a lumbar puncture that day and Dr. Petroff noted that the opening pressure was somewhat

21   elevated which suggested "pseudotumor cerebri in addition to focal myelopathy."  AR 619.  On

22   November 30, 2004, Plaintiff reported occasional headaches and blurring of vision and her arms

23   were still numb at times.  Her cerebrospinal fluid was entirely normal, although it had been under

24   increased opening pressure.  Physical and neurological examination findings were normal.  Plaintiff

25   had lumbosacral discomfort which caused some degree of antalgia of gait.  Dr. Petroff's diagnosis

26   was (1) pseudotumor cerebri, (2) transverse myelitis, (3) back strain, and (4) lumbosacral

27   degenerative disc disease.  He recommended a repeat MRI of the C-spine, prescribed Diamox

28   medication, and physical therapy for her low back pain and for conditioning/weight loss.  AR 618.

On December 28, 2004, Plaintiff reported to Dr. Petroff that she was doing much better.  Her headaches were less intense and less frequent with the Diamox medication.  She had mild tingling in her toes and fingers from the medication.  Her vision was stable.  She had left forearm tingling at times.  She had no other sensory weakness, but did have general fatigue.  She stated that her low back was "all right."  She had not attended therapy, but was doing a stretching regimen on her own.  Dr. Petroff noted that  "[a]ctivities of daily living are being fulfilled."  She had some low back discomfort on straight leg raising, but the remainder of the examination was normal.  AR 617.  On February 8, 2005, Plaintiff reported that she was doing well and her headaches were much better.  She had mild pressure type headaches which responded to Tyenol.  She experienced severe headaches after she stopped taking the Diamox for two days, but regained control over them when she restarted the Diamox.  Dr. Petroff's diagnosis remained the same.  AR 616.

Plaintiff submitted a medical article on pseudotumor cerebri that was downloaded from the internet on April 8, 2013.  AR 247-250.  The article states that pseudotumor cerebri occurs when the intracranial pressure increases.  Symptoms of pseudotumor cerebri mimic those of brain tumor.  Symptoms include ringing in the ears, photopsia, vomiting, nausea, double vision, dizziness, back pain, neck pain, blurred vision, headaches, and visual obscurations.  Pseudotumor cerebri can be diagnosed by brain imaging to rule out other conditions, eye examinations and lumbar puncture.  Pseudotumor cerebri is treated with glaucoma medications and with migraine headache medications.

Ms. Perryman was admitted to Spring Valley Hospital on December 3, 2008 with complaints of headaches and neck pain for three days.  She stated that the headaches and neck pain occurred approximately every three months, but usually went away in three hours.  Her current headaches were persisting.  AR 683.  She reported that she had been diagnosed with pseudotumor cerebri in 2004, that she had chronic neck-cervical spine problems, and chronic low back pain due to an L4-L5 disc bulge.  While in the hospital, Plaintiff was evaluated by Dr. Gobinder Chopra, a neurologist.  She told Dr. Chopra that she had taken diuretics (Diamox) for about two years after she was diagnosed with pseudotumor cerebri in 2004.  She then gradually tapered off diuretics.  Whenever she had a headache, she would increase her caffeine intake and lie flat for about 24 hours and the headaches would go away.  She also reported that she was having some back pain, but did not have

numbness or weakness in the arms or legs.  She felt that her vision was blurry and she had

fluctuations in her vision if she jumped up from a lying position or when she stood up from sitting

down.  AR 675.  An MRI of the brain on December 4, 2008 showed an area of CSF signal intensity

along the medial left temporal lobe suggestive of volume loss and possible mesiotemporal sclerosis.

AR 685.

>   According to the December 8, 2008 hospital discharge summary prepared by Dr. Ritu Joshi:
>
>> [Plaintiff] was started on Diamox and morphine p.r.n.  She also
>> received Tyenol and Phenergan.  Protonix for GI prophylaxix was
>> given.  The patient underwent an MRI of the brain, which showed a
>> mesial temporal sclerosis.  An MRA of the brain showed a small
>> basilar artery.  Secondary to abnormal results of MRI, she underwent
>> an EEG which was positive for seizures, per Dr. Singh, and the patient
>> was started on Keppra.
>>
>> At this point, the patient is feeling much better, and she wants to go
>> home. . . .

AR 681.

Plaintiff was discharged on December 8, 2008 with instructions to continue taking Diamox

and Keppra, and to follow-up with Dr. Chopra and her primary care physician.  Plaintiff was also

advised to see a neuro-ophthalmologist to make sure she did not have vision abnormalities.  Follow-

up MRIs of the brain and cervical spine were recommended in one or two months.  AR 681.

Ms. Perryman was seen at Dr. Chopra's clinic on December 15, 2008.  She was thereafter

seen in follow-up in January, February, March, April, and June 2009.  AR 372-378.  The handwritten

notes for these visits indicate that Plaintiff was seen for a history of headaches, but the notes are

largely indecipherable.  On January 26 to 29, 2009, Plaintiff underwent a digitrace video ambulatory

monitoring study which showed "a normal background activity for both the awake and sleeping

states.  The patient did not report any clinical events during the study.  No seizures were picked up

on the automatic seizure detection system.  In addition, no inter-ictal epleptiform activity was

recorded.  Clinical correlation is suggested."  AR 393.

Dr. Edgar Evangelista saw Ms. Perryman at the Chopra clinic on December 22, 2009 and

summarized her medical condition and treatment since the December 2008 hospitalization.  He noted

that Plaintiff was examined by Dr. Wade Crowe, a neuro-ophthalmologist, who did not find any

11

1   signs of papilledema and that her ophthalmologic examination was otherwise normal.  Plaintiff was

2   prescribed Keppra following the diagnosis of mesial temporal sclerosis and signs of seizure, but Dr.

3   Boulware stopped this medication because he did not believe her symptoms were caused by seizure

4   activity.  After ceasing Keppra, Ms. Perryman "noticed some episodes where she would zone out,

5   have unexplained sudden mood swings and unexplained bruising in the lumbar region.  She also has

6   chronic fatigue."  Plaintiff also reported that since Thanksgiving she had numbness below the left

7   knee in the anterior shin area.  There was also some giveaway weakness and she favored the left leg

8   when ambulating.  Dr. Evangelista prescribed follow-up MRIs of the brain and lumbar spine, and

9   EMG nerve conduction studies of both lower extremities.  He restarted the Keppra medication and

10  referred Plaintiff for another ophthalmologic examination.  AR 370.

11      Ms. Perryman underwent electro-diagnostic nerve conduction studies on January 20, 2010

12  which revealed evidence of a left lower lumbar to sacral radiculopathy with ongoing denervation, but

13  no reinnervation.  AR 389.  A brain MRI was performed on February 5, 2010.  The radiologist noted

14  that he was not provided with prior exams or reports for comparison.  No intracranial mass or infarct

15  was appreciated and there were no signs of temporal mesial sclerosis.  He stated that if a prior exam

16  was obtained, an addendum to the report would be made.  AR 386.  An MRI of the lumbar spine was

17  also performed on February 5, 2010 which revealed  "a 7mm posterior broad-based central disk

18  extrusion causing ventral dural deformity and compressing the left L5 nerve root" at L4-L5.  AR 387.

19  Plaintiff was seen at the Abrams Eye Institute in January and March 2010 for an ophthalmologic

20  examination which was normal.  AR 257-264.

21      Plaintiff saw Dr. Jason Garber, a neurosurgeon, on March 9, 2010.  AR 276-277.  Dr. Garber

22  noted that Plaintiff reported difficulty with her left lower extremity since November 2009, that she

23  had difficulty walking and had subjective motor weakness in her left lower extremity.  AR 276.

24  Based on the lumbar MRI, Dr. Garber recommended microlumbar discectomy surgery which he

25  performed on June 2, 2010.  AR 266-271, 277-297.  Dr. Garber saw Ms. Perryman in post-surgical

26  follow-up on June 15, 2010 at which time he noted that "she is doing remarkably well from her

27  preoperative state.  She still has some intermittent numbness and tingling down her left lower

28  extremity that is significant (sic) improved since her preoperative state."  Dr. Garber stated that

Plaintiff could do activities as tolerated, with no bending, lifting or twisting and that he would see her on a p.r.n. basis.  AR 275.

Ms. Perryman was hospitalized for one day on two occasions between July 29, 2010 and September 25, 2010 for a painful kidney stone.   She was treated for this condition by Dr. Lawrence Newman.  AR 332-355.  On October 26, 2010, Dr. Newman noted that an MRI revealed that Ms. Perryman had an adrenal cyst which was a benign process.  He scheduled her for follow-up in six months.  AR 350-352.

Ms. Perryman returned to Dr. Evangelista on June 8, 2011.  In a letter to Dr. Chaney on that date, Dr. Evangelista noted that Plaintiff had microlumbar discectomy surgery a year earlier.  He further stated:

> Unfortunately she did not follow up with me post surgery and continued to have residual left leg weakness with eversion of the left foot, and now she presents to me with progressive weakness on the left lower extremity that started a week prior to this visit. She has also had increasing numbness from just below the knee radiating to the toes. This subsequently involved the left lateral thigh with muscle spasms and giveaway weakness.  Within the few days into week, this has actually spread to the right lower extremity.  At this point, she cannot ambulate with any stability on both lower extremities.  She denies any bowel-bladder dysfunction or saddle anesthesia.  There has been no evaluation for the past year or so.  She denies any recent trauma to precipitate these symptoms.  After a long discussion with the patient and her family, she is willing to go into St. Rose Hospital for evaluation.
> . . .
>
> Physical and neurologic examinations reveal a patient who is in severe discomfort.  She could not sit straight.  She had pain in the lumbar region but marked on examination showed weakness of hip flexion, knee extension/flexion, ankle dorsiflexion and plantarflexion bilaterally.  This may also be pain independent of any pain in the lumbar region.  The deep tendon reflexes were hyperreflexic at 3+ on the knees and reduced to 1+ on the ankles.  Gate was very unsteady, wide based and required assistance.

AR 366.

Dr. Evangelista recommended that Plaintiff go to St. Rose Hospital for neuro-imaging and neurosurgical evaluation.  He also indicated that physical therapy should be initiated and she would likely require acute rehabilitation.  AR 367.

Ms. Perryman was admitted to St. Rose Hospital from June 8-15, 2011.  AR 399-407.  The

1  admitting physician noted that following the June 2010 surgery "there was partial improvement, but

2  time and weakness and numbness progressively increased.  Like 7 to 10 days ago, the patient started

3  to experience weakness and numbness in the right leg involving the thigh, the lower leg and the

4  foot."  He further noted that Plaintiff had no headache and no vision problem.  She did not have any

5  numbness in the face, chest or upper extremities.  AR 399.  Plaintiff reported to other physicians or

6  medical providers that it was very difficult for her to go from sitting to standing or attempt to

7  ambulate at all due to weakness.  AR 401.  On examination, Plaintiff was able to move her upper and

8  lower extremities, but had difficulty moving her lower extremities without discomfort.  She was able

9  to go from a sitting to standing position, but had extreme difficulty doing so.  AR 402.  The

10  discharging physician, Dr. Janapati, provided a diagnosis of paraparesis with bilateral lower

11  extremity pain.  He noted that Plaintiff had complete imaging of her brain and her spinal column

12  which revealed some mild degenerative disk disease.  No nerve compression or spinal stenosis was

13  noted, and there was "nothing to account for the patient's degree of paraparesis."  Dr. Janapati

14  discussed Plaintiff's condition with Dr. Evangelista and stated: "We recommend educating the

15  patient on rehabilitation and [Dr. Evangelista] will follow the patient as an outpatient for further

16  testing of neuromuscular disorders, including outpatient EMG and nerve conduction studies."  AR

17  406.  Because of Plaintiff's poor functional status she was transferred to HealthSouth Henderson for

18  inpatient rehabilitation and overall improvement in strength, gait, and endurance.  AR 405.

19      Ms. Perryman was admitted to the HealthSouth Rehabilitation Hospital on June 16, 2011.

20  AR 420-422.  The attending physician, Dr. Gao, noted that Plaintiff "has been having significant

21  debility, with difficulty in self-care, especially ambulation."  Plaintiff was motivated and willing to

22  participate in therapy.  Dr. Gao further noted that Plaintiff has a history of a seizure and pseudotumor

23  cerebri which was stable with current medications.  AR 420.  Plaintiff denied headaches, diplopia

24  (double vision), otalgia (earache), vertigo, dysphagia (difficult swallowing), shortness of breath,

25  chest pain, nausea or vomiting, liver or stomach problems, constipation or diarrhea, and

26  incontinence.  AR 420.  She also denied depression and pyschosis.  She did complain of chronic

27  back pain.  AR 420-421.  Physical examination of Plaintiff's upper extremities revealed bilateral

28  upper extremity motor and sensory symmetrical, no deviation.  Motor strength in her lower

extremities was fair, although she had spasm and tremor which was very inconsistent during the examination.  The deep tendon reflexes in the lower extremities were symmetrical, 1+.  Hoffman's sign and Babinski's sign were negative.  No significant abnormal motor tone was noted in the lower extremities.  AR 421.  Dr. Gao stated that the plan was to provide aggressive physical and occupational therapy, a generalized reconditioning program and psychiatric support.  He noted that there was likely a psychiatric component to Plaintiff's functional paraparesis.  He recommended reducing her pain medication "as much as we can."  AR 421.  Dr. Gao estimated that Plaintiff's stay would be one to two weeks, and that "hopefully the patient can regain her function in bilateral lower extremities, improving mobility and able to go home with family."  AR 422.

Plaintiff was discharged from HealthSouth on or about June 21, 2011.  AR 423-449.  She saw Dr. Naomi Chaney on August 12, 2011.  Dr. Chaney noted that the etiology of Plaintiff's symptoms was not well defined.  She also noted that Plaintiff's father was going to Scripps clinic and she gave Plaintiff a referral to Scripps to obtain an evaluation.  AR 500.

Ms. Perryman saw Dr. Simon Farrow, a neurologist, on October 31, 2011.  His report states Plaintiff came in with her father.  AR 463.  Dr. Farrow summarized Plaintiff's complaints as follows:

> She has persistent numbness and weakness and drags her left leg.  The whole left leg below her knee is numb and painful.  In May of this year, she began to experience similar symptoms in the right leg, but also above the knee in the inner aspect of her thigh.  Now both legs are numb so that she cannot feel them below the knees.  She cannot feel her feet.  Both feet and legs are heavy and is difficult to pick them up.  They kind of drag.  She has spasms through both legs from the hips down.  The spasms also radiate into her thighs and buttocks.  Occasionally and variably she has shooting pains into all different parts of her legs.  She also has joint pain in the hips.
>
> She has numbness and tingling in her arms and hands from the elbows on down which may come on unpredictably and may last for several days.  Sometimes, her face is numb.

AR 463.

Plaintiff also stated that she could not sleep properly because she could not get comfortable.  She had occasional short-term memory loss.  Dr. Farrow noted that she had peripheral vision problems demonstrated by ophthalmologist presumably in the context of pseudotumor cerebri.  AR 464.

Dr. Farrow stated that Plaintiff's general appearance was unremarkable.  He detected no specific abnormalities on palpation of the head and neck.  Her arms and legs were unremarkable on inspection, palpation and manipulation.  Plaintiff's affect appeared normal.  She was not obviously depressed, excessively anxious, hypomanic or pressurized.  Her cognitive function seemed normal.  There was no prominent focal abnormality of production or understanding of speech, short or long-term memory, body image and somatic representation, spatial orientation, social awareness and interaction of executive function.  There was no obvious evidence of perseveration, distractibility, delusional ideas, hallucinations or other breakdown of thought patterns.  Examination of Plaintiff's vision, facial movement, hearing and speech were within normal limits.

Dr. Farrow concluded:

> Motor patterns, strength, dexterity, repetitive movements, tone, somatic sensation, deep tendon reflexes, planter responses, gait and station appeared unremarkable.  The patient had some difficulty in remembering which leg was supposed to be impaired when she was walking around outside the examination room.
>
> She has been very extensively investigated including MRI scan of the entire neuraxix.  Neurological examination was entirely normal.  I would also be deeply skeptical about the need for ongoing diagnosis of mesial temporal sclerosis and pseudotumor cerebri.  In fact, I see no evidence of significant "organic" disease of the nervous system presently.  I don't have anything to offer this patient.

AR 464.

On November 19, 2011, Dr. Navdeep S. Dhaliwal, a state agency physician, prepared a physical residual functional capacity assessment of the Plaintiff in which he found that she was capable of performing light work.  AR 470-477.  Dr. Dhaliwal noted that the recent examination by Dr. Farrow reported as normal.  AR 470.  Dr. Pastor Roldan, a state agency psychologist, prepared a "Psychiatric Review Technique" on November 21, 2011 in which he found that Plaintiff had no medically determinable mental impairment.  AR 485-497.  Dr. Roldan noted that Plaintiff had normal mood and affect on July 29, 2010 and that Dr. Farrow found "[n]ormal cognitive function; difficulty remembering which leg was supposed to be impaired when walking."  AR 497.

Plaintiff was seen in follow-up by Dr. Chaney on January 25, 2012.  Dr. Chaney noted that Dr. Farrow "has no defining etiology for her symptomatology."  Dr. Chaney further noted that she

16

had recommended that Plaintiff go to a tertiary center, but Plaintiff had "no funds to allow for this to occur." AR 502.   Dr. Chaney saw Plaintiff again in follow-up on May 2, 2012, September 20, 2012, and March 6, 2013 without any material change in her condition. AR 705-709.  Plaintiff was also evaluated by Dr. Miranda, a cardiologist, with Nevada Heart and Vascular Center on October 8, 2012 and November 5, 2012.  Plaintiff also had an echocardiogram on October 30, 2012.  The echocardiogram and her cardiopulmonary findings on examination appear to have been normal.  AR 669-673.  Dr. Miranda diagnosed Plaintiff with metabolic syndrome with obesity and adjusted Plaintiff's medications.  AR 670, 673.  She also recommended that Plaintiff obtain a second opinion regarding her progressive neuropathy, perhaps from the Cleveland Clinic or the Barrow Institute in Phoenix, Arizona.  AR 673.

### C.   Administrative Law Judge's July 8, 2011 Decision.

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration in 20 CFR 404.1520 in determining whether Plaintiff was disabled.  AR 9-11.  At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014 and that she had not engaged in substantial gainful activity since December 5, 2009.  At step two, he found that Plaintiff had the following severe impairments: pseudotumor cerebri, degenerative disc disease of the lumbar spine and obesity.  (20 CFR 404.1520(c).  AR 11.  The ALJ stated that Plaintiff's seizure disorder, temporal mesial sclerosis, small kidney cyst, diabetes mellitus, herpes zoster, and uretral stone did not result in any significant limitation on her ability to do basic work activities and were "non-severe impairments."  AR 12.  There also was no evidence that Plaintiff had been diagnosed with mood disorder or sought treatment for it.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  AR 13.  He noted that Plaintiff did not argue that her impairments met or medically equaled a listing, and he concluded from record that they did not.  AR 13.

Prior to step four of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), except that she

1   could never climb ropes, ladders, or scaffolds, could occasionally climb ramps and stairs, balance,

2   kneel, bend, stoop, crouch and crawl.  She also needed to avoid even moderate exposure to

3   hazardous machinery, unprotected heights and operational control of moving machinery due to her

4   history of seizure.  AR 13.  The ALJ found that Plaintiff's allegations regarding the severity of her

5   symptoms and limitations, and claims of worsening symptoms were not credible, and that the record

6   as a whole did not support a finding that her symptoms were so severe as to be disabling.  AR 13-14.

7       With respect to Plaintiff's pseudotumor cerebri, the ALJ noted that her chief symptom was

8   headaches, but that there was little evidence that she had experienced disabling symptoms since

9   February 2009.  AR 14.  With respect to her degenerative disc disease, the ALJ noted that Plaintiff

10  underwent discectomy surgery in June 2010.  While this would normally weigh in the Plaintiff's

11  favor, the ALJ found that it was offset by the records which indicated that the surgery was generally

12  successful in relieving her symptoms.  The ALJ specifically noted Dr. Jason Garber's statement that

13  Plaintiff was doing "remarkably well post-operatively" and that she had only intermittent numbness

14  and tingling down her left lower extremity.  AR 14.  There was also no evidence of any treatment

15  related to her back between June 2010 and June 2011.  The ALJ stated that "Dr. Newman noted in

16  June 2011 that Plaintiff did not follow-up after the surgery."[3]  Although the Plaintiff complained of

17  progressive weakness in her lower extremities after June 2011, there was no evidence of nerve

18  impingement.  AR 14.  The ALJ made particular reference to Dr. Farrow's normal physical and

19  neurological examination findings in October 2011, and his statement that Plaintiff "had some

20  difficulty in remembering which leg was supposed to be impaired when she was walking around

21  outside the examination room."  There was no record of further treatment after October 2011 and no

22  evidence that any treating doctor had placed restrictions on Plaintiff despite her allegations of totally

23  disabling symptoms.  AR 14.

24      The ALJ afforded some weight to the medical opinion of Dr. Dhaliwal regarding Plaintiff's

25  RFC.  He afforded little weight to the opinions of Plaintiff's husband, father and daughter regarding

26  the severity of her symptoms because they were not supported by the record as a whole.  AR 15.  The

27

28       [3] It was actually Dr. Evangelista who made this statement.  AR 366.

ALJ found that Plaintiff's statements regarding the severity of her symptoms and limitations were disproportionate to the objective medical findings, were exaggerated and not fully credible.  He stated that Plaintiff "admitted certain abilities" which partly supported his RFC determination.  Plaintiff took care of her children and her dog with some help from her sister and husband.  She did not need special reminders to take care of her personal needs, grooming or taking medications.  She prepared meals almost daily, and dusted, washed dishes and swept.  She went outside daily and was able to go out alone.  She was able to drive an automobile.  She shopped in stores and could handle her own finances.  She spent time with family, listened to music and met with friends for coffee.  She drove an automobile three to four days a week to pick her daughter up from school and drove to the store once a month.  Finally, the ALJ noted that there was evidence that Plaintiff may have stopped working for reasons unrelated to her disability, i.e., she was fired due to a policy violation.   AR 15.

Based Plaintiff's RFC, the ALJ found at step four that she could perform her past relevant work as a customer service representative/teller, management trainee, personnel scheduler and cashier/checker.  AR 15.  He also alternatively found at step five that Plaintiff could perform other light and sedentary work available in the national economy including general office clerk, cashier, hand packager, information clerk, interviewer, bookkeeping clerk, sorter, credit clerk and order clerk.  AR 16-17.  The ALJ stated that there was insufficient evidence to support a finding that Plaintiff required a sit/stand option.  If this option was required, however, Plaintiff would still be able to perform her prior work as personnel scheduler, and could also perform the jobs of sorter, hand packager, cashier and bookkeeping clerk.  The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from December 5, 2009 through the date of his decision.  AR 17.

## DISCUSSION

### I.    Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II. Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) she suffers from a medically determinable physical or mental impairment that can be expected to

20

result in death or that has lasted or can be expected to last for a continuous period of not less that

twelve months; and (b) the impairment renders the claimant incapable of performing the work that

the claimant previously performed and that she incapable of performing any other substantial gainful

employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.

*Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the

claimant establishes an inability to perform her prior work, the burden shifts to the Commissioner to

show that the claimant can perform a significant number of other jobs that exist in the national

economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

       Social Security disability claims are evaluated under a five-step sequential evaluation

procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*, 180

F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any point

during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  The five steps

of the evaluation process are outlined in the ALJ's decision and will not be repeated here.  AR 9-11.

The ALJ also analyzed Plaintiff's claim in accordance with the evaluation process and concluded at

steps four and five that she was not disabled.

### III.    Whether the ALJ Erred in Finding that Plaintiff Had the Residual Functional Capacity to Perform Light Work.

       Plaintiff challenges the ALJ's determination that she had the residual functional capacity to

perform light work, which led him to conclude that she could perform her past relevant work or other

light or sedentary work.  The medical evidence shows that Plaintiff complained of low back pain, leg

pain, and numbness in her arms, wrists and hands, as well as complaints of headaches and fatigue in

2004 and early 2005.  Dr. Petroff diagnosed the causes of Plaintiff's symptoms to be pseudotumor

cerebri, transverse myelitis, back strain, and lumbosacral degenerative disc disease.  AR 618.  It

appeared that Plaintiff's symptoms significantly improved by late 2004/early 2005 and that her

headaches were controlled by Tyenol and Diamox.  AR 616.  She continued to work for the next four

years until her termination in May 2009.

1       Plaintiff was hospitalized in December 2008 for headaches and neck pain.  Plaintiff told the

2 doctor that she had tapered off the Diamox about two years after it was prescribed in late 2004 and

3 that she had controlled her headaches through increasing her caffeine intake and by rest.  AR 675.

4 During this hospitalization she was re-prescribed Diamox, as well as Keppra for possible seizures,

5 and was feeling much better at the time of discharge.  AR 681.  The subsequent medical records in

6 2009 indicate some issues with headaches, but Plaintiff's symptoms appeared to increasingly focus

7 on her low back and left lower extremity symptoms which culminated in her lumbar discectomy

8 surgery in June 2010.   As the ALJ noted, Dr. Garber reported thirteen days after the surgery that

9 Plaintiff was doing remarkably well and had experienced significant improvement in her condition.

10 AR 275.  Plaintiff did not return to Dr. Garber with any subsequent complaints of low back or lower

11 extremity symptoms.  Nor did she contact her neurologist, Dr. Evangelista, about any worsening

12 symptoms until June 2011 when she presented with complaints of progressive weakness in both the

13 left and right lower extremities.  AR 366.

14       Plaintiff argues that her hospitalization in June 2011 supports her allegation of disability.

15 The discharging physician for that hospitalization stated, however, that imaging of Plaintiff's spinal

16 column revealed only mild degenerative disc disease, no nerve compression or spinal stenosis, and

17 that there was "nothing to account for the patient's degree of paraparesis."  AR 406.  The physician

18 at the rehabilitation hospital also noted that Plaintiff had significant debility, but her spasm and

19 tremor was very inconsistent during the examination and there was likely a psychiatric component to

20 her functional paraparesis.  AR 421.

21       The ALJ appeared to give substantial weight to the October 2011 examination findings and

22 opinions of Dr. Farrow.  AR 14.  Dr. Farrow found that Plaintiff's arms and legs were unremarkable

23 on inspection, palpation and manipulation.  He stated that Plaintiff "had some difficulty in

24 remembering which leg was supposed to be impaired," which was an obvious comment on the

25 credibility of her complaints.  Neither Dr. Farrow or any physician, however, expressly opined that

26 Plaintiff was malingering.  Dr. Farrow stated that Plaintiff's medical condition "ha[d] been very

27 extensively investigated including MRI scan of the entire neuroaxis" and that the neurological

28 examination was entirely normal.  He was deeply skeptical about the ongoing diagnosis of mesial

1  temporal sclerosis and pseudotumor cerebri. He, in fact, saw no evidence of significant organic
2  disease of the nervous system. AR 464. Dr. Farrow's examination findings were consistent with
3  those of the other physicians who saw Plaintiff in 2011, including Dr. Evangelista and her primary
4  care physician, Dr. Chaney, who noted, but did not dispute Dr. Farrow's findings. AR 502.

5          Dr. Chaney and Dr. Miranda recommended that Plaintiff be evaluated at a tertiary center such
6  as Scripps, the Cleveland Clinic or the Barrow Institute. Plaintiff was unable obtain such an
7  evaluation due to lack of insurance or funds. The ALJ did not criticize Plaintiff for not pursuing
8  such an evaluation. Nor does this Court. Lack of insurance or funds is a reasonable explanation for
9  a claimant to not pursue further medical evaluation or treatment. *Orn v. Astrue*, 495 F.3d 625, 638
10  (9th Cir. 2007). It simply remains unknown, however, whether an evaluation at such a facility would
11  have identified any underlying medical causes for Plaintiff's allegedly severe low back and lower
12  extremity symptoms.

13          In the absence affirmative evidence showing that a claimant is malingering, the ALJ's
14  reasons for rejecting the credibility of the claimant's testimony regarding the severity of her pain or
15  other symptoms must be clear and convincing. The ALJ must state the reasons why the testimony is
16  unpersuasive and specifically identify what testimony or evidence undermines the claimant's
17  complaints. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009); *Morgan v. Comm'r
18  of Soc. Sec. Admin.,* 169 F. 3d 595, 599 (9th Cir. 1999). If the claimant produces objective medical
19  evidence of an underlying impairment, the ALJ may not reject her subjective complaints solely on a
20  lack of medical evidence to fully corroborate the alleged severity of her pain. *Burch v. Barnhart*,
21  400 F.3d 676, 680 (9th Cir. 2005), citing *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991). Pain
22  testimony may establish greater limitations than can medical evidence alone. *Id.*, citing SSR 96–7p
23  (1996). As discussed above, however, there is substantial doubt whether the Plaintiff had an
24  underlying medical impairment in 2011 that could reasonably explain her complaints of disabling
25  pain, numbness or weakness.

26          In determining credibility, the ALJ may engage in ordinary techniques of credibility
27  evaluation, such as considering the claimant's reputation for truthfulness and inconsistencies in
28  claimant's testimony. *Burch*, 400 F.3d at 680, citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th

Cir.2001).  The ALJ may also consider other factors such as (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) the type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities.  *Id.*, citing *Bunnell,* 947 F.2d at 346 (quoting SSR 88–13 (1988)) (superceded by SSR 95–5p (1995)).

The ALJ found that Plaintiff's ability to engage in a variety of daily activities such as taking care of her children, personal grooming, taking medication, preparing meals and cleaning, going outside daily, driving an automobile, shopping and handling her own finances were consistent with his determination of her RFC, and therefore contrary to her claims of chronic, disabling symptoms.  A claimant's ability to engage in normal activities of daily living may suggest that the claimant is capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).  The Ninth Circuit has also stated, however, that "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). "'The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferrable to a workplace environment where it might be impossible to rest periodically or take medication.'"  *Id.*, quoting *Smolen v. Chater*, 80 F.3d 1272, 1287 n7 (9th Cir. 1996).

Plaintiff's and her family members' description of her limited activities of daily living do not necessarily conflict with the inability to perform light or sedentary work on a daily basis.  Plaintiff's ability to engage even in such limited activities, however, appears at odds with her complaints of debilitating pain, numbness and weakness in her lower extremities.  Combined with the lack of objective medical findings to account for her symptoms and Dr. Farrow's observation of Plaintiff's questionable symptom behavior, the ALJ's finding that Plaintiff's testimony was not credible was supported by clear and convincing reasons.  The ALJ also properly considered the fact that Plaintiff

stopped working in May 2009 because she was terminated for a violation of bank policy, rather than because she was physically unable to work. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). *See also Harrelson v. Astrue*, 273 Fed.Appx. 632, at *3 (9th Cir. 2008) (unpublished decision).

## CONCLUSION

It may be that Plaintiff's alleged debilitating symptoms are, in fact, caused by some underlying physical or mental conditions over which she has no control.  It was Plaintiff's burden to prove that she is disabled, however, and she has not carried that burden in this case.  The ALJ provided factually and legally valid reasons for rejecting the credibility of her statements and those of her family members regarding the severity of her symptoms.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Motion for Reversal and/or Remand (#15) be **denied**, and that Defendant's Cross-Motion to Affirm and Response to Plaintiff's Motion for Reversal (#18) be **granted**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 4th day of April, 2016.

GEORGE FOLEY, JR.
United States Magistrate Judge

25